**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION**

| | | |
|---|---|---|
| STANDARD PROCESS INC., a Wisconsin Corporation, | : | Case No:  18-CV-849 |
| | : | |
| Plaintiff, | : | **COMPLAINT FOR DAMAGES,** |
| | : | **INJUNCTIVE, AND OTHER RELIEF** |
| v. | : | **FOR VIOLATION OF 15 USC § 1114;** |
| | : | **15 USC § 1125(a); 15 USC § 1125(c); AND** |
| AVC INFINITE, LLC, A VITAMIN A DAY LLC, ANDREW CHEKAYEV, | : | **RELATED CLAIMS** |
| | : | |
| IRINA PEYSAKHOVICH, and JOHN DOES 1-100, individually or as corporate/business entities, | : | **DEMAND FOR JURY TRIAL** |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

Plaintiff Standard Process Inc. ("Standard Process") brings this action against Defendants AVC Infinite, LLC ("AVC Infinite"), A vitamin a day LLC ("A vitamin a day"), Andrew Chekayev ("Chekayev"), Irina Peysakhovich ("Peysakhovich"), and John Does 1-100 (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125, unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); common law trademark infringement; common law unfair competition; deceptive trade practices in violation of Wis. Stat. § 100.18; and tortious interference with contract and business relations, and alleges as follows.  These claims arise from Defendants' misappropriation of Standard Process's trademarks in conjunction with Defendants' unlawful and unauthorized sale of Standard Process®-brand products on the Internet, including the sale of non-genuine and poor quality products bearing the Standard Process trademark.

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Standard Process Inc. is a Wisconsin corporation with its principal place of business located in Palmyra, Wisconsin.

2.      Upon information and belief, Defendant AVC Infinite, LLC is a limited liability company, organized under the laws of the State of New York, with its principal place of business in Brooklyn, New York, and operator of the "Vitaminpro" and "I & G Brothers" storefronts on www.amazon.com ("Amazon").

3.      Upon information and belief, Defendant A vitamin a day LLC is a limited liability company, organized under the laws of the State of New Jersey, with its principal place of business in Ringwood, New Jersey, and operator of the "Vitaminpro" and "I & G Brothers" storefronts on Amazon.

4.      Upon information and belief, Defendant Andrew Chekayev is a natural person who resides in Brooklyn, New York who operates and does business through the United States as the "Vitaminpro" and "I & G Brothers" storefronts on Amazon.  Upon information and belief, Mr. Chekayev directs, controls, ratifies, participates in, and is the moving force behind the unlawful activity alleged herein.

5.      Upon information and belief, Defendant Irina Peysakhovich is a natural person who resides in Ringwood, New Jersey who operates and does business through the United States as the "Vitaminpro" and "I & G Brothers" storefronts on Amazon.  Upon information and belief, Ms. Peysakhovich directs, controls, ratifies, participates in, and is the moving force behind the unlawful activity alleged herein.

6.      The true names, involvement, and capacities, whether individual, corporate, associated or otherwise of Defendants John Does 1 through 100 are unknown to Standard Process.  Therefore, Standard Process sues these Defendants by a fictitious name.  Standard Process is informed and believes, and on that basis alleges, that the John Doe Defendants sued herein are equally responsible for the events and occurrences referred to herein or otherwise

interested in the outcome of the dispute.  When the true names, involvement, and capacities of these parties are ascertained, Standard Process will seek leave to amend this Complaint accordingly.

## JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338 for Standard Process's claims that arise under federal law and 28 U.S.C. § 1367 for Standard Process's claims that arise under state law because they form part of the same case or controversy as Standard Process's claims that arise under federal law.

8.    This Court has personal jurisdiction over Defendants because they have sold, distributed, shipped, marketed, and advertised infringing goods bearing the Standard Process trademark in Wisconsin and have done so with the knowledge that Standard Process is located in Wisconsin and will be harmed by their actions in Wisconsin.

9.    This Court also has personal jurisdiction over Defendants because they have knowingly caused injury to Standard Process in Wisconsin by engaging in solicitation and service activities in Wisconsin and selling products into Wisconsin that were used and consumed within Wisconsin in the ordinary course of trade.

10.    This Court also has personal jurisdiction over Defendants because they have sufficient minimum contacts with Wisconsin such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.  Defendants have purposefully directed their activities at Wisconsin and purposefully availed themselves of the privilege of conducting business in Wisconsin by operating multiple highly interactive online storefronts on Amazon in which they sell, distribute, ship, market, and advertise infringing goods bearing the Standard Process trademark in Wisconsin.   Through these storefronts, Defendants have advertised, sold, and shipped infringing products bearing the Standard Process trademark in

3

Wisconsin and to Wisconsin consumers.  These actions have caused injury to Standard Process in Wisconsin and Defendants have engaged in these actions with the knowledge that their actions would cause injury to Standard Process in Wisconsin.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district and because Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Standard Process And Its Trademarks

12.     Standard Process develops, manufactures, and sells ingestible, high-quality nutritional supplements, including products under the Standard Process®, Standard Process Veterinary Formulas™, and MediHerb brands (the "Standard Process Products").  Standard Process sells its products exclusively through a network of authorized resellers ("Authorized Resellers").

13.     Standard Process devotes a significant amount of time, energy, and resources toward protecting the value of the Standard Process brand, products, name, and reputation.  By distributing Standard Process Products exclusively through its Authorized Resellers, Standard Process ensures that users of Standard Process Products receive the high-quality products they expect from Standard Process, as well as the customer service and information that only Authorized Resellers can provide.  In the highly-competitive nutritional supplement market, quality and customer service are a fundamental part of the consumer's decision to purchase a product.

14.     To promote and protect the Standard Process brand, Standard Process has registered numerous trademarks with the United States Patent and Trademark Office, including, but not limited to: STANDARD PROCESS® (U.S. Trademark Registration No. 2,329,616),

SP® (U.S. Trademark Registration Nos. 2,469,448, 2,888,707, and 3,618,534), SP STANDARD PROCESS® (U.S. Trademark Registration No. 3,726,215), CATALYN® (U.S. Trademark Registration No. 1,476,530), ZYPAN® (U.S. Trademark Registration No. 1,982,691), LIGAPLEX® (U.S. Trademark Registration No. 1,984,258), CATAPLEX® (U.S. Trademark Registration No. 1,984,251), CONGAPLEX® (U.S. Trademark Registration No. 1,995,346), MULTIZYME® (U.S. Trademark Registration No. 2,548,738), ALLERPLEX® (U.S. Trademark Registration No. 2,321,705), GASTREX® (U.S. Trademark Registration No. 2,332,945), SP CLEANSE® (U.S. Trademark Registration No. 2,622,227), GASTRO-FIBER® (U.S. Trademark Registration No. 2,730,337), and SP GREEN FOOD® (U.S. Trademark Registration No. 3,665,686) (collectively, the "Standard Process Trademarks").

15.     The registration for each of the Standard Process Trademarks is valid, subsisting and in full force and effect.  Further, pursuant to 15 U.S.C. § 1065, the Standard Process Trademarks serve as conclusive evidence of Standard Process's ownership of the marks and its exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of the Standard Process Products identified in the registrations, as provided by 15 U.S.C. § 1115(b).

16.     Standard Process filed the STANDARD PROCESS® trademark on May 7, 1999, and it was registered on March 14, 2000.  Standard Process has actively used the STANDARD PROCESS® trademark since that time.

17.     Standard Process has actively used, advertised, and marketed products under the Standard Process Trademarks throughout the United States for decades.

18.     Since 1929, Standard Process has been dedicated to the field of nutritional supplements and the whole food philosophy and has been devoted to improving the quality of life by providing safe, effective, high quality dietary supplements.

19.     Consumers recognize the Standard Process Trademarks as being associated with safe, effective, high-quality dietary supplements.

20.     Consumers identify the Standard Process name as offering a wide range of premium herbal and nutritional products that are easy to implement into any nutritional program.

21.     The Standard Process name is recognized by healthcare practitioners and consumers as a visionary leader in whole food nutrient solutions, as Standard Process applies systems thinking to holistic nutrition that empowers practitioners to transform lives.

22.     The Standard Process name is also recognized by healthcare practitioners and consumers as providing individualized, clinical nutrition featuring whole food ingredients grown on their certified organic farmland.

23.     For all these reasons, the Standard Process Trademarks are widely recognized by the general consuming public of the United States and Standard Process is recognized as the source of products bearing the Standard Process Trademarks.

24.     Due to the superior quality and exclusive distribution of Standard Process Products, and because Standard Process is uniquely recognized as the source of these high quality products, the Standard Process Trademarks have substantial value.

**Online Marketplaces and the Challenges They Present To
Standard Process Product Quality**

25.     E-commerce retail sales have exploded over the past decade.  From 2007 to 2017, the percentage of retail sales that were completed through e-commerce channels rose from 3.1%

to 8.2%. https://www.digitalcommerce360.com/2017/02/17/us-e-commerce-sales-grow-156-2016/; https://fred.stlouisfed.org/series/ECOMPCTSA.

26.     In 2016, consumers spent $394.86 billion on e-commerce sales, a 15.6% increase from 2015. *Id.* The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2016 United States consumers spent $147.0 billion in e-commerce sales on Amazon, a 31.3% increase from 2015. *Id.*

27.     While the online marketplaces have created a great deal of opportunity, they also greatly challenge a manufacturer's ability to control the quality and safety of its products.

28.     For example, consumers who purchased products through the online marketplaces cannot touch, inspect, or interact with the product before purchasing it and cannot select a different product if the one they initially select is damaged or has been tampered with. Instead, consumers must trust that the product they choose over the Internet will arrive and be of the quality they expect and typically receive from the manufacturer.

29.     The marketplaces also allow third-parties to sell products anonymously, i.e., without disclosing their actual identity or sources to consumers. As such, any person who is able to obtain a manufacturer's products through unauthorized diversion can sell them on the online marketplaces without having to reveal his/her identity to the consuming public. This effectively prevents the manufacturer and the consumer from being able to reach sellers, like Defendants, and address quality issues.

30.     It is common for these unauthorized sellers to sell diverted products well past their expiration date or to mix fake or diluted products in shipments to unwitting consumers. https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html. Indeed, there is an "epidemic" of counterfeit products being sold on the

online marketplaces that diverters are exploiting because they know consumers trust these marketplaces and think that the products they are buying through these marketplaces are genuine. https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes.

31.     Because these diverters, like Defendants, operate anonymously on marketplaces and undertake great measures to maintain anonymity, manufacturers have no ability to exercise their quality controls over the products they sell or to ensure that the products are safe.   A manufacturer's inability to exercise control over the quality of these products presents serious risks to the health and safety of consumers – particularly where, as here, the product is ingested by the consumer.

32.     Online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity because their construction and user interface suggest that all sellers on the marketplaces are all selling the same product when – as is the case here – they are not.

33.     When purchasing product on a marketplace, customers cannot easily distinguish between a manufacturer's authorized and unauthorized sellers.  Indeed, on some marketplaces, all sellers are listed under one product listing, making it practically impossible for consumers to ascertain which sellers are authorized and subject to the brand's quality standards and which are selling unauthorized products outside of the manufacturer's quality controls.  Unlike brick-and-mortar channels where a consumer can simply select another product from the shelf where the initial product selected appears to be of compromised quality, e-commerce consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality. This reality requires that brands implement unique quality control programs into their e-commerce channels to protect their goodwill and consumers.

34.    It is widely understood that when a customer purchases a product on an online marketplace and receives a damaged, defective, expired, or poor quality product, the customer is much more likely to associate that frustration with the brand/manufacturer than the anonymous seller.

35.    The online marketplaces give disgruntled customers a powerful and convenient forum to air their grievances about poor quality products – product reviews.  Any consumer who is dissatisfied with a product he/she receives can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand/manufacturer of a product rather than the marketplace seller that sold the product.

36.    It is widely accepted that product reviews on the online marketplaces have significant impact on a brand's reputation.  Survey results show that 82% of United States adults sometimes consult online reviews when buying a new product online and 40% "always" or "almost always" consult reviews.  http://www.pewinternet.org/2016/12/19/online-reviews/.

37.    Consumers place extraordinary trust in these online reviews, as they are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers. https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.

38.    Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product.  https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

**Standard Process Has Been The Target Of Multiple Negative Online Marketplace Reviews From Customers Who Purchased Products From Unauthorized Sellers**

39.    Standard Process has been a victim of the issues caused by unauthorized sellers on the online marketplaces.   Indeed, Standard Process has received several negative online marketplace reviews from customers who purchased products from unauthorized sellers.

40.    On June 6, 2015, a customer, Monique Wisniewski, complained that she received a damaged product: "This item came damaged.  I left it in the box in my cabinet until I needed them(around 2 weeks until I finished my other bottle)  They looked at [sic] if they were wet at one time.  Completely sealed, but they even smell different.  I have used this product before and they do not have this texture or color.  I take them as well as my 13 yr old son, and I don't feel comfortable giving them to him in this condition.  I unfortunately am not able to return as it states this item is not returnable.it was expensive and I can't use them.  Damaged goods, do not buy."

⭐☆☆☆☆ **and I don't feel comfortable giving them to him in this condition**
By monique Wisniewksi on June 6, 2015
Flavor: Gluten Free | Size: 360 Tablets | Verified Purchase

This item came damaged. I left it in the box in my cabinet until I needed them(around 2 weeks until I finished my other bottle) They looked at if they were wet at one time. Completely sealed, but they even smell different. I have used this product before and they do not have this texture or color. I take them as well as my 13 yr old son, and I don't feel comfortable giving them to him in this condition. I unfortunately am not able to return as it states this item is not returnable.it was expensive and I can't use them. Damaged goods, do not buy.

▸ Comment | 2 people found this helpful. Was this review helpful to you?   Yes    No   Report abuse

41.    On June 21, 2015, another customer, Debra L Geary, complained that she received the product with the bottle shattered: "Recd bottle shattered in box.  Dghtr accidentally threw away paperwork so I was not able to call & request replacement—out almost $40 with no product!"



⭐☆☆☆☆ **Received Product Shattered in Box**
By Debra L Geary on June 21, 2015
**Verified Purchase**

Recd bottle shattered in box. Dghtr accidentally threw away paperwork so I was not able to call & request replacement--out almost $40 with no product!

▸ 1 comment   |   Was this review helpful to you?   Yes   No   Report abuse

42.     On January 27, 2016, a customer, Robbie Paez, complained that he received a damaged product: "I received my livaplex today, the bottom of the bottle was broken off, glass in the pills."



⭐☆☆☆☆ **Shipping was careless**
By Robbie Paez on January 27, 2016
**Verified Purchase**

I received my livaplex today, the bottom of the bottle was broken off , glass in the pills



43.     On February 24, 2016, a customer, hdpoet_7, complained that she received an expired product: "I ordered Livaplex and it was delivered promptly. However when I looked at the expiration date it was so close that my use of the product would go well beyond the expiration date on the package. had I been told this I would not have purchased it."



44.     On July 30, 2016, another customer, nala123, complained that she did not receive an authentic product: "This had been the worst shake I've ever had. I've been using Standard Process provides [sic] for years now so I know when driving [sic] is not right.  I mixed it with the usual spring water and the mixture was frothy and some of the powder stayed at the surface

and the rest just say [sic] at the bottom.  The taste was off as well.  I mixed evening [sic] in a blender bottle with the spiral mixer ball.  I won't be buying from this seller again.  Please make sure your product is the original or you could get a lot of people sick or worse.  Very disappointed!!"



45.     On October 31, 2016, another customer, Sasha, complained that she received a defective product: "Defective products. Did not work what always worked before. Got it from a doctor and pills look totally different in color. Old pill were sold. Overpriced rip-off. Do not buy from this seller. Buy from licensed professional. Cheaper and works. Product is GREAT and WORKS, when bought fresh."



46.     On May 19, 2017, a customer, LB, complained that he received a product that had been tampered with: "Wish I could comment and give no stars. Received this today and half the label was covered up with a blank white avery type label. This was on both the box and the bottle. I tried peeling it off, but it peeled off whatever was underneath as well. The bottle was very obviously tampered with!"



47.     On September 8, 2017, another customer, D. Michaelis, complained that he received an expired product: "Product was received at expiration date.  Couldn't return. Terrible.  Purchased a second bottle hoping for a better outcome.  That bottle came with the same expiration date.  Out $140 and had to throw in garbage.  Beware!"



48.     On November 13, 2017, another customer, Ms. Right, complained that she did not receive an authentic product: "I have been using this product for years with great success, I always get it from my doctor.  I couldn't get to his office so decided to order on Amazon. Anyone who has taken this knows there is a very distinct smell to it.  Well what I got has absolutely no smell and the tablets are not the same at all, color, texture, everything is different. I have to believe this is not authentic Zypan."



49.     Upon information and belief, the foregoing complaints were made by consumers who purchased products from unauthorized sellers of Standard Process Products.

50.     Upon information and belief, other consumers have complained about the products they received from unauthorized sellers, like Defendants, including the sale of expired, damaged, defective, and/or tampered-with products.

### Standard Process Has Implemented Quality Controls To Combat The Problems Presented By The Online Marketplaces And Protect The Value Of Its Trademarks

51.     Recognizing the health and safety risks to its consumers and the reputational concerns associated with the illegal sale of Standard Process Products by unauthorized sellers, Standard Process has implemented a quality control program that applies to both brick and mortar retail settings and online sellers with the twin aims of protecting consumers and protecting the value and goodwill associated with the Standard Process brand.

52.     The goal of this program is to ensure that consumers who buy Standard Process Products online receive products that feature all of the special characteristics that consumers have come to expect from products sold under the Standard Process name – in particular, safety and quality.

53.     The program seeks to minimize the likelihood that poor quality products will reach consumers.  By preventing consumers from receiving poor quality products, the program both protects consumers from confusion and unsafe products and also protects the value and goodwill associated with the Standard Process brand.

54.     Standard Process abides by its quality control requirements. Further, as discussed below, Standard Process requires its Authorized Resellers to abide by its quality control requirements and audits its Authorized Resellers to ensure that they abide these quality controls.

55.     Standard Process's ability to exercise these quality controls is particularly important for the products it sells because consumers ingest the products and there are numerous

health and safety risks associated with consumers ingesting products that are expired or that have not been stored and handled properly.

56.     Standard Process's ability to exercise these quality controls is essential to the integrity, safety, and quality of Standard Process Products, as well as the value of the Standard Process Trademarks and other intellectual property.

### Authorized Resellers Are Required To Adhere To Standard Process's Quality Control and Customer Service Requirements

57.     Standard Process maintains its strict quality controls over Standard Process Products by conducting all sales through its Authorized Resellers.

58.     Authorized Resellers are permitted to sell Standard Process Products only in approved channels and are required to abide by Standard Process's resale policy and other policies and procedures (collectively, the "Standard Process Policies").

59.     To prevent third parties from acquiring and reselling Standard Process Products, the Standard Process Policies permit Authorized Resellers to sell products only to end users. Authorized Resellers are prohibited from selling Standard Process Products to anyone who intends to resell the products.

60.     Authorized Resellers are also prohibited from selling Standard Process Products on any website, except through Patient Direct by Standard Process, without prior written consent of Standard Process.  This restriction includes a prohibition against selling Standard Process Products on any third-party marketplaces such as Amazon, eBay, Walmart Marketplace, or Craigslist.

61.     These restrictions allow Standard Process to know who its Authorized Resellers are, which ones are selling online, and how to immediately contact them.

62. The Standard Process Policies require Authorized Resellers to adhere to Standard Process's quality control requirements.

63. To ensure that customers receive the genuine and high-quality products they expect from Standard Process, the Standard Process Policies require Authorized Resellers to inspect all products for damage, defects, broken seals, evidence of tampering, and other non-conformance and remove all such products from inventory.

64. To prevent the sale of expired products, Authorized Resellers are also required to inspect inventory regularly for expired or soon-to-be expired products and remove those products from inventory.

65. The Standard Process Policies also require that Authorized Resellers store the products in accordance with guidelines issued by Standard Process. Importantly, for the health and safety of consumers, Authorized Resellers must store Standard Process Products in accordance with any directions on product labels or other storage guidelines and as otherwise specified by Standard Process.

66. To avoid consumer confusion and ensure that customers receive genuine Standard Process Products, Authorized Resellers are prohibited from relabeling, repackaging, or altering Standard Process Products. Authorized Resellers must not remove, translate, or modify the contents of any label or literature on or accompanying Standard Process Products. Further, Authorized Resellers are prohibited from tampering with, defacing, or otherwise altering any identifying information on Standard Process Products, including lot codes, batch codes, and UPCs.

67. Standard Process also ensures that consumers receive safe products by requiring its Authorized Resellers assist with recalls and other consumer safety information efforts.

68. The Standard Process Policies also require Authorized Resellers to provide certain services to their customers. Authorized Resellers must familiarize themselves with the features of all Standard Process Products kept in their inventory. This requirement ensures that Authorized Resellers are uniquely qualified not only to recommend the Standard Process Products best suited for end-user consumers' needs and well-being, but also to advise end-user consumers on how to use Standard Process Products safely and properly.

69. Following the sale of genuine Standard Process Products, Authorized Resellers supply ongoing support to end-user consumers and are expected to provide expeditious customer service by responding promptly to consumer inquiries.

70. Standard Process's quality control requirements are legitimate and substantial and have been implemented so that Standard Process can control the quality of goods manufactured and sold under the Standard Process Trademarks, so as to protect consumers, as well as the value and goodwill associated with the Standard Process Trademarks.

71. Standard Process's quality controls are also material, as they are designed to protect consumers and prevent them from receiving poor quality products that could harm them. These quality controls are particularly important for Standard Process Products because they are ingested by consumers.

72. Consumers would find it material and relevant to their purchasing decision to know whether a Standard Process product they were considering buying was being sold by an Authorized Reseller who is subject to Standard Process's quality control requirements or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, Standard Process's quality controls and over whom Standard Process is unable to exercise its quality controls.

**Given The Flood Of Poor Quality Products On The Marketplaces And Consumers' Inability To Inspect Products, Standard Process Imposes Additional Requirements On Its Authorized Resellers Who Sell On The Online Marketplaces**

73.     Given the many unscrupulous resellers, like Defendants, selling products on the online marketplaces, any party wishing to sell Standard Process Products on an online marketplace must first be vetted and approved by Standard Process to be an authorized online reseller ("Authorized Online Resellers").  Authorized Online Resellers may sell Standard Process Products only on websites that Standard Process has specifically approved, which again allows Standard Process to have full visibility and oversight over those parties authorized to sell its products online.

74.     Authorized Online Resellers are vetted by Standard Process to ensure that they meet Standard Process's criteria and that they will properly represent the Standard Process brand.

75.     Critical to Standard Process's ability to exercise its quality controls over products sold online is that Standard Process must know on what websites its Authorized Online Resellers are selling and under what storefront names.  Accordingly, Authorized Online Resellers are prohibited from selling anonymously and must clearly state their business name and current contact information on any website where they sell Standard Process Products.  This requirement allows Standard Process to verify its Authorized Online Resellers and to immediately address any quality issues or negative issues that arise.

76.     To be approved by Standard Process, Authorized Online Resellers must have an appropriately registered and recognized business that meets applicable criteria (i.e. credit, sales history, facility requirements).

77.     Authorized Online Resellers must also have an acceptable online review history, without a significant presence of negative product or seller reviews.

78.     Authorized Online Resellers must also have an acceptable business operating record, which includes evaluating, among other things, any lawsuits, complaints, or actions related to the delivery of damaged products, misrepresented products, poor-quality products, or other similar issues.

79.     In addition to complying with the quality controls and customer service requirements discussed above, Authorized Online Resellers must adhere to several additional requirements.

80.     Authorized Online Resellers must comply with all applicable data security, accessibility, and privacy requirements.

81.     Authorized Online Resellers must agree not to represent or advertise any product as "new" that has been opened or repackaged.  Typically, if a customer returns a product that was purchased through a marketplace, the marketplace will allow the product to be repackaged and relisted as "new."  Standard Process prohibits its Authorized Online Resellers from allowing this to occur in order to ensure that customers receive the high quality Standard Process Products they expect.

82.     Unless otherwise approved by Standard Process, Authorized Online Resellers must agree to not fulfill orders in any way that results in the shipped product not coming from product stock in the Authorized Online Resellers' possession.  Standard Process must review and approve any use of third-party fulfillment services.

83.     Authorized Online Resellers must also cooperate with any product tracking Standard Process implements or utilizes.

84.     Authorized Online Resellers must have a mechanism for soliciting customer feedback/reviews and must take appropriate steps to address that feedback.  Authorized Online

Resellers must cooperate with Standard Process in investigating any negative product reviews. Again, this requirement is a critical component of Standard Process's quality control program because it allows Standard Process to quickly address quality issues that arise, which it is unable to do for products sold by unauthorized sellers like Defendants.

85.     Authorized Online Resellers who sell on Amazon must also maintain a certain seller feedback score.

86.     Authorized Online Resellers who sell on Amazon must prevent the commingling of their Standard Process Products with the products of other sellers in Amazon warehouses and must prevent orders from being fulfilled in any way that potentially results in delivery to the consumer of a product from another seller's stock.  This requirement is crucial to ensuring that consumers who purchase products through Authorized Online Resellers receive genuine Standard Process Products.  Most sellers who store products in Amazon's warehouses allow their products to be commingled with other sellers' inventory.  As such, when a consumer purchases a product through a particular storefront, the consumer could receive a product that came from the inventory of a number of different sellers, including a product that is counterfeit or fake. Standard Process's anti-commingling quality control requirement prevents this from happening and ensures that the Standard Process Products that are sold by its Authorized Online Resellers are products that were distributed through Standard Process's authorized channels and comply with Standard Process's quality controls.

87.     To further its efforts and ability to assure product quality and adherence to its quality control standards, protect the value and goodwill associated with the Standard Process brand, and to prevent consumer confusion, Standard Process has approved only one Authorized Online Reseller on the Amazon Marketplace.  This limitation allows Standard Process to closely

20

monitor its seller and product reviews and to promptly address any issues directly with its approved seller. This limitation also helps prevent the confusion that exists when consumers are presented with many marketplace sellers and are unable to discern which are authorized and subject to Standard Process's quality controls.

88.     The additional quality control requirements that Standard Process imposes on its Authorized Online Resellers are legitimate and substantial and have been implemented to allow Standard Process to control the quality of Standard Process Products that are sold online and quickly address any quality issues that arise.

89.     These quality controls are also material, as they have been implemented to ensure that consumers purchasing Standard Process Products online receive genuine, high-quality Standard Process Products that abide by Standard Process's quality controls. Consumers purchasing Standard Process Products online would find it relevant to their purchasing decision to know whether the product they are purchasing is being purchased from an Authorized Online Reseller who is subject to, and abides by Standard Process's quality controls.

### Standard Process Ensures That Its Authorized Online Resellers Complies With Its Quality Control Requirements

90.     In order to ensure that its Authorized Online Resellers adheres to Standard Process's quality control requirements, Standard Process regularly monitors sales of its products online.

91.     Pursuant to this program, Standard Process regularly monitors its Authorized Online Resellers and online product and seller reviews, conducts test purchases and inspections, and confirms each Authorized Online Reseller's compliance with all of its quality control and Authorized Online Reseller requirements.

92.     Standard Process is also able to communicate with its Authorized Online Resellers to understand the nature of any negative reviews and to facilitate appropriate follow-on action items.  Standard Process is also able to discipline an Authorized Online Reseller if it fails to comply.

**Defendants Are Not Authorized Resellers Or Authorized Online Resellers And Do Not Comply With Standard Process's Requirements**

93.     In addition to auditing its Authorized Online Resellers, due to the health and safety risks to customers and reputational concerns associated with the illegal sale of products bearing the Standard Process Trademarks by unauthorized Internet sellers, Standard Process polices the sale of its products online.

94.     In the course of monitoring online listings of Standard Process Products, Standard Process discovered products bearing the Standard Process Trademarks being illegally sold by Defendants on Amazon.

95.     Standard Process discovered Defendants illegally selling products bearing the Standard Process Trademarks through the "Vitaminpro" and "I & G Brothers" storefronts on Amazon.

96.     Defendants are not Authorized Resellers of Standard Process Products, do not comply with Standard Process's Authorized Reseller requirements, and are not subject to, and do not comply with, the Standard Process Policies.

97.     Defendants are not Authorized Online Resellers of Standard Process Products and do not comply with the additional quality control requirements Standard Process imposes on its Authorized Online Resellers.

98.     Defendants have not applied to be an Authorized Online Reseller of Standard Process Products and Standard Process has not approved Defendants to be an Authorized Online Reseller of its products.

99.     Defendants could not be approved as an Authorized Online Reseller because they do not comply with Standard Process's requirements.

100.    Defendants do not comply with Standard Process's requirements because they operate their business anonymously.  Defendants sell products on their Amazon storefront anonymously and do not provide customers information about their business or how to contact them.

101.    Defendants do not comply with Standard Process's requirements because they do not operate an appropriately registered and recognized business that meets Standard Process's requirements for credit history, sales history, and facilities requirements.  Indeed, a review of court filings reveals that Mr. Chekayev and his business have had several lawsuits filed against them, including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and fraud.  *See, e.g., Government Employees Ins. Co., GEICO Indemnity Co., GEICO General Ins. Co., and Geico Cas. Ins. Co. v. Bay L's Medical Supplies, Inc. and Andrew Chekayev*, Case No. 1:13-cv-02361 (E.D.N.Y. 2013).

102.    Defendants do not comply with Standard Process's requirements because they do not maintain an appropriate seller feedback rating on their I & G Brothers storefront. Defendants' seller feedback score is only 89% - a score well below what Standard Process requires its Authorized Amazon Reseller to maintain.

103.    Despite not being approved as Authorized Resellers or Authorized Online Resellers of Standard Process Products and not meeting the requirements Standard Process

imposes on its Authorized Resellers and Authorized Online Resellers, Defendants have sold, and continue to sell, products bearing the Standard Process Trademarks on their Amazon storefronts.

### Defendants Are Selling Damaged And Poor Quality Products
### Through Their Amazon Storefronts

104.    Defendants do not abide by Standard Process's quality control requirements.

105.    Evidence of Defendants' failure to comply with Standard Process's quality control requirements can be seen by reviewing the customer reviews on their Amazon storefront pages.

106.    Multiple consumers have posted negative reviews about the products Defendants sold them through their Amazon storefronts or the customer service Defendants provided them.

107.    For example, on July 1, 2018, a customer complained that Defendants sold her a damaged product and then failed to remedy the situation: "Upon receipt of product, cap was loose and lotion leaked all over … I received 'permission' to return the item and did so with the postage paid label provided. Despite the seller receiving the returned item on 6/6/ and me contacting them on 6/23, it is now 6/30 and I have heard nothing / received no refund.  I had to contact Amazon directly for A-Z guarantee refund."

⭐☆☆☆☆ "Upon receipt of product, cap was loose and lotion leaked all over (no problem - it happens.) I received 'permission' to return the item and did so with the postage paid label provided. Despite the seller receiving the returned item on 6/6 and me contacting them on 6/23, it is now 6/30 and I have heard nothing / received no refund. I had to contact Amazon directly for A-Z guarantee refund."
Read less

By Rachael Munro on July 1, 2018.

108.    On May 28, 2018, another customer complained that she never received the product she ordered from Defendants: "Order was lost. I never received it so I can't return it."

 "Order was lost. I never received it so I can't return it."
By lmg on May 28, 2018.

109.     These types of complaints about Defendants are typical of the complaints made about products sold and customer service provided by unauthorized sellers, including the sale of damaged and poor quality products.

110.     Upon information and belief additional consumers have made complaints about the quality of products Defendants sold them, including complaints related to products bearing the Standard Process Trademarks.

111.     As discussed above, Defendants maintain a seller feedback rating of only 89% on the I & G Brothers storefront.

**Defendants Do Not Abide By Standard Process's**
**Quality Controls And Customer Service Requirements**

112.     Defendants do not abide by Standard Process's quality control measures that are imposed upon genuine Standard Process Products.

113.     Defendants do not comply with Standard Process's quality control requirements because they have not provided Standard Process their business information or given Standard Process an opportunity to vet them to determine if they meet the high level of standards that Standard Process demands of its Authorized Online Resellers.

114.     Defendants do not comply with Standard Process's quality control requirements because they sell products on their Amazon storefront anonymously.  Defendants' storefront page does not include their mailing address, phone number, email address, or any other contact information.  In fact, as discussed further below, Defendants undertake great efforts to maintain anonymity and prevent anyone from contacting them regarding their business and the shady, poor quality products they sell to unwitting consumers.  Defendants' concerted efforts at maintaining anonymity prevents Standard Process from addressing any quality issues or negative reviews that arise out of Defendants' sale of products bearing the Standard Process Trademarks.

115.    Defendants also do not comply with Standard Process's quality control requirements because they have not disclosed to Standard Process where they acquire products that bear the Standard Process Trademarks.  Defendants' failure to provide such information prevents Standard Process from determining if there are any quality issues with the products Defendants are selling or if they are subject to a recall or consumer safety information effort.

116.    Defendants do not comply with Standard Process's quality control inspection requirements because, upon information and belief, they do not inspect the products they sell for damage, defects, broken seals, evidence of tampering, and other non-conformance from inventory, and sell products bearing the Standard Process Trademarks that are damaged, have broken seals, and that have been tampered with.  As set forth above, Defendants ship damaged products to customers.

117.    Defendants do not comply with Standard Process's quality control inspection requirements because, upon information and belief, they do not regularly inspect their inventory for expired or soon-to-be-expired products and remove those products from inventory; rather, Defendants sell products bearing the Standard Process Trademarks that are expired or soon-to-be expired.

118.    Defendants do not comply with Standard Process's quality control storage requirements because, upon information and belief, they do not store their products in accordance with the storage guidelines specified by Standard Process.

119.    Defendants do not comply with Standard Process's quality control storage requirements because they store their products at Amazon warehouses and, upon information and belief, allow their inventory stored at Amazon's warehouses to be commingled with other sellers' inventory.  Defendants' failure to comply with this quality control requirement results in

their products being commingled with fake, counterfeit, and tampered with products from other sellers, and ultimately results in consumers purchasing fake, counterfeit, and tampered with products from Defendants' storefront.

120.    Defendants do not comply with Standard Process's quality control storage requirements because Amazon fulfills their orders and, upon information and belief, they allow Amazon to fulfill orders from their storefront with products that do not come from Defendants' inventory, including fake, counterfeit, and tampered with products.   Defendants' failure to comply with this quality control requirement results in unknowing consumers purchasing fake, counterfeit, and tampered with products from Defendants' storefront.

121.    Defendants do not comply with Standard Process's quality control requirements because, upon information and belief, they resell products as "new" that have been opened or repackaged.   This practice results in consumers who believe they are purchasing new Standard Process Products actually receiving returned products that have been opened or have had their safety seal broken.

122.    Defendants do not comply with Standard Process's quality control requirements related to handling, packaging, and shipping of products because, upon information and belief, they do not package and ship their products in accordance with Standard Process's requirements. As set forth above, Defendants ship products in a manner that allows them to become damaged.

123.    Defendants' failure to abide by these quality controls interferes with Standard Process's quality controls and prevents Standard Process from exercising control over the quality of products Defendants sell bearing the Standard Process Trademarks.   Standard Process is unable to audit Defendants to ensure they are complying with Standard Process's quality controls

and/or close their account if they fail to comply with Standard Process's quality control requirements.

124.    Defendants' failure to comply with these quality controls also interferes with Standard Process's quality controls because it prevents Standard Process from being able to obtain Defendants' assistance with any recall or consumer safety information efforts that may arise related to any products they are selling or have sold in the past.

125.    Defendants also do not comply with Standard Process's customer service requirements because they are not qualified or trained to accurately describe, demonstrate, and sell the products in their inventory and to advise customers on how to use Standard Process Products safely and properly.

126.    Defendants also do not comply with Standard Process's customer service requirements because they do not, and are unable to, provide the advice to consumers that Standard Process requires of its Authorized Resellers and do not provide the type of ongoing support and response to consumer inquiries that Standard Process requires of its Authorized Resellers.  As set forth above, multiple consumers have complained about the lack of customer service Defendants provided them.

127.    Defendants do not comply with Standard Process's quality control and customer service requirements because, upon information and belief, they do not take appropriate steps to address negative reviews from customers and do not cooperate with Standard Process in investigating negative product reviews.

**Defendants Are Infringing On The Standard Process Trademarks By Selling Products
Bearing The Standard Process Trademarks That Are Not Subject To, Do Not Abide By,
And Interfere With Standard Process's Quality Controls
And Customer Service Requirements**

128. For all of the reasons set forth above, the products Defendants sell bearing the Standard Process Trademarks fail to adhere to the extensive and legitimate quality controls that Standard Process exercises over genuine Standard Process Products to protect consumers and the goodwill of the Standard Process brand.

129. As set forth above, the products sold by Defendants are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements.

130. Because the products Defendants sell are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Standard Process Products.

131. Because the products Defendants sell are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirement, the products Defendants sell are not genuine Standard Process Products.

132. Defendants' unauthorized sale of products bearing the Standard Process Trademarks is likely to, and does, create consumer confusion because consumers who purchase products from Defendants believe they are purchasing genuine Standard Process Products when, in fact, they are not.

133. Defendants' unauthorized sale of products bearing the Standard Process Trademarks infringes on the Standard Process Trademarks and diminishes their value.

134.     Despite these facts, Defendants have sold, and continue to sell, products bearing the Standard Process Trademarks through their Amazon storefronts without Standard Process's consent.

135.     Upon information and belief, through their interactive Amazon storefronts, Defendants have advertised and marketed infringing products bearing the Standard Process Trademarks to consumers in Wisconsin.

136.     Upon information and belief, through their interactive Amazon storefronts, Defendants have accepted and fulfilled orders of infringing products bearing the Standard Process Trademarks from consumers in Wisconsin.

137.     Upon information and belief, through their interactive Amazon storefronts, Defendants have shipped infringing products bearing the Standard Process Trademarks to Wisconsin.

**Standard Process Has Repeatedly Attempted To Stop Defendants' Illegal Sale Of Products Bearing The Standard Process Trademarks But Defendants Continue To Willfully Infringe On The Standard Process Trademarks**

138.     Standard Process first discovered Defendants illegally selling products bearing the Standard Process Trademarks on the Vitaminpro storefront in October 2017.

139.     After Standard Process discovered products bearing the Standard Process Trademarks being illegally sold on the Vitaminpro storefront, Standard Process investigated the storefront to determine who was operating the storefront.

140.     Because Defendants do not disclose their business or contact information on their storefront and sell products through the storefront anonymously, Standard Process had to spend significant time and money investigating the storefront to attempt to identify the sellers connected to the storefront.

141.    Standard Process was unable to identify who was operating the Vitaminpro storefront.

142.    Because Standard Process could not identify the operators of the Vitaminpro storefront, it had to utilize Amazon's messaging system to contact Defendants.  On or about October 18, 2017, counsel for Standard Process sent Defendants a cease and desist letter via Amazon messaging notifying Defendants of their illegal conduct.  The letter advised Defendants that they were infringing on the Standard Process Trademarks, tortiously interfering with Standard Process's contracts, and causing harm to Standard Process. The letter demanded that they immediately cease selling products bearing the Standard Process Trademarks.

143.    Defendants did not respond to this letter.

144.    Standard Process continued to investigate the Vitaminpro storefront.  Despite spending significant time and money investigating the storefront, Standard Process was unable to identify the operators of the Vitaminpro storefront.

145.    Because Standard Process could not identify the operators of the Vitaminpro storefront it was forced to serve a subpoena seeking identification information regarding the operators of the Vitaminpro storefront.

146.    On or about February 13, 2018, counsel for Standard Process received information through a subpoena that identified the operators of the Vitaminpro storefront as Irina (no last name), Andrew Chekayev and AVC Infinite, LLC at 1685 East 5th Street, Apartment 2G, Brooklyn, New York 11230.

147.    On or about April 4, 2018, Defendants relisted products bearing the Standard Process Trademarks on the Vitaminpro storefront.

148. On or about April 11, 2018, counsel for Standard Process sent Defendants a cease and desist letter to 1685 East 5th Street, Apartment 2G, Brooklyn, New York 11230, demanding that they immediately cease selling products bearing the Standard Process Trademarks.

149. Defendants did not respond to this letter.

150. On or about July 26, 2018, Defendants relisted products bearing the Standard Process Trademarks on the Vitaminpro storefront.

151. On or about August 8, 2018, counsel for Standard Process sent Defendants another letter, and advised Defendants that Standard Process would take further action if Defendants did not immediately cease and desist selling products bearing the Standard Process Trademarks.

152. Defendants did not respond to this letter and continued to offer products bearing the Standard Process Trademarks on the Vitaminpro storefront.

153. Despite receiving several cease and desist letters and draft complaints from Standard Process, on or about September 17, 2018, Defendants increased their listings of products bearing the Standard Process Trademarks on the Vitaminpro storefront.

154. On or about September 27, 2018, Standard Process found an additional address for Defendants in Ringwood, New Jersey. Standard Process connected the address to Irina Peysakhovich and determined that she was the Irina identified in the information Standard Process received in response to the subpoena.

155. On or about September 28, 2018, Standard Process sent a cease and desist letter to Irina Peysakhovich at 67 Coventry Way, Ringwood, NJ 07456.

156. Defendants did not respond to this letter and continued to offer products bearing the Standard Process Trademarks on the Vitaminpro storefront.

157.    Standard Process discovered Defendants listing products bearing the Standard Process Trademarks on the I & G Brothers storefront in June 2018.

158.    Again, because Defendants do not disclose their business or contact information on their storefront and sell products through the storefront anonymously, Standard Process had to spend significant time and money investigating the storefront to attempt to identify the sellers connected to the storefront.

159.    Standard Process was initially unable to identify who was operating the I & G Brothers storefront for months.  After significant investigation, Standard Process was recently able to confirm that AVC Infinite and Andrew Chekayev are registered as the operators of the I & G Brothers storefront.

160.    Standard Process has repeatedly explained to Defendants that by illegally selling products bearing the Standard Process Trademarks that they are, among other things, infringing on the Standard Process Trademarks, tortiously interfering with Standard Process's contracts, and causing significant harm to Standard Process.

161.    Defendants have ignored these letters and continued to engage in their illegal activities and sales of products bearing the Standard Process Trademarks.

162.    As discussed above, the products Defendants sell are not genuine Standard Process Products and are materially different from genuine Standard Process Products.

163.    By continuing to sell non-genuine products bearing the Standard Process Trademarks, Defendants have interfered with Standard Process's ability to exercise control over products being sold bearing the Standard Process Trademarks.

164.    Defendants have also misled, and continue to mislead, consumers into believing they are purchasing genuine Standard Process Products when, in fact, they are not.

165.    Defendants' actions infringe on the Standard Process Trademarks.

166.    Further, Defendants' disregard of communications from Standard Process and continuation of selling of non-genuine products despite being informed of their unlawful conduct, demonstrates that they are acting intentionally, willfully, and maliciously.

**Defendants Are Tortiously Interfering With Standard Process's
Agreements With Its Authorized Resellers**

167.    Upon information and belief, Defendants have purchased Standard Process Products from Standard Process Authorized Resellers for purposes of reselling them on the Internet.

168.    The Standard Process Policies prohibit Standard Process's Authorized Resellers from selling Standard Process Products to third parties who intend to resell the products.

169.    Defendants were informed of this prohibition by at least October 18, 2017. Indeed, the cease and desist letter Standard Process sent Defendants on October 18, 2017 informed Defendants that Standard Process restricts the manner in which Authorized Resellers may sell Standard Process Products, and that Authorized Resellers may sell Standard Process Products only to end-user customers through authorized channels and are specifically prohibited from selling products to resellers or any person or entity they know or have reason to know intends to resell the products.

170.    Defendants were also informed that by purchasing Standard Process Products from an Authorized Reseller for purposes of resale, they were causing a breach of the agreement between Standard Process and its Authorized Reseller and interfering with Standard Process's agreements and business relationships.

171.    Defendants were also advised that if they continued to acquire Standard Process Products from Standard Process's Authorized Resellers for purposes of resale, they would be liable for tortiously interfering with Standard Process's contracts and/or business relationships.

172.    Despite being provided this information, upon information and belief, Defendants have continued to acquire Standard Process Products from Standard Process's Authorized Resellers.

173.    Upon information and belief, Defendants willfully and knowingly induced unknown Authorized Resellers to breach their agreements with Standard Process so that they could acquire Standard Process Products and resell them.

**Standard Process Has Suffered Significant Harm As A Result Of Defendants' Conduct**

174.    As set forth above, the unauthorized sale of products bearing the Standard Process Trademarks through unauthorized sellers, such as Defendants, has caused significant harm to the Standard Process brand.

175.    When a consumer receives a poor quality, damaged, or tampered-with product from Defendants, the consumer associates that negative experience with Standard Process.  As such, Defendants' ongoing sale of unauthorized products bearing the Standard Process Trademarks harms the Standard Process brand.

176.    Standard Process has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

177.    Standard Process has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights and brand integrity.

178.    Standard Process is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell Standard Process Products, causing continued irreparable harm to Standard Process's reputation, goodwill, relationships, intellectual property and brand integrity.

179.    Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton and contrary to law.

180.    Defendants' willful violations of the Standard Process Trademarks and continued pattern of misconduct demonstrate intent to harm Standard Process.

**FIRST CAUSE OF ACTION**
**Trademark Infringement**
**U.S.C. §§ 1114 and 1125(a)(1)(a)**

181.    Standard Process hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

182.    Standard Process is the owner of the Standard Process Trademarks.

183.    Standard Process has registered the Standard Process Trademarks with the United States Patent and Trademark Office.

184.    The Standard Process Trademarks are valid and subsisting trademarks in full force and effect.

185.    Defendants willfully and knowingly used, and continue to use, the Standard Process Trademarks in interstate commerce for purposes of selling products bearing the Standard Process Trademarks on the Internet without Standard Process's consent.

186.    The products Defendants sell bearing the Standard Process Trademarks are not authorized for sale by Standard Process.

187.    Standard Process has established and implemented legitimate and substantial quality control procedures that genuine Standard Process Products must comply with.

36

188.     Standard Process abides by these quality control procedures and requires all of its Authorized Resellers to abide by these quality controls.

189.     Standard Process's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.

190.     The products Defendants sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements.

191.     Because the products Defendants sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Standard Process Products.

192.     Because the products Defendants sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements, the products Defendants sell are not genuine Standard Process Products.

193.     Defendants' unauthorized sale of products bearing the Standard Process Trademarks interferes with Standard Process's quality controls and ability to exercise quality controls over products bearing the Standard Process Trademarks.

194.     Defendants' unauthorized sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to, and abide by, Standard Process's quality controls when, in fact, they do not.

195.     Defendants' unauthorized sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Standard Process Products when, in fact, they are not.

196.     Defendants' unauthorized sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Standard Process when, in fact, they are not.

197.     Defendants' unauthorized use of the Standard Process Trademarks has infringed upon and materially damaged the value of the Standard Process Trademarks and caused significant damage to Standard Process's business relationships.

198.     As a proximate result of Defendants' actions, Standard Process has suffered, and continues to suffer immediate and irreparable harm.  Standard Process has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

199.     Standard Process is entitled to recover the damages caused by Defendants' infringement of the Standard Process Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

200.     Standard Process is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Standard Process will suffer irreparable harm.

201.     Standard Process is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Standard Process Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition
### 15 U.S.C. § 1125(a)

202.     Standard Process hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

203.     Standard Process is the owner of the Standard Process Trademarks.

204.     Standard Process has registered the Standard Process Trademarks with the United States Patent and Trademark Office.

205.     The Standard Process Trademarks are valid and subsisting trademarks in full force and effect.

206.     Defendants have willfully and knowingly used, and continue to use, the Standard Process Trademarks in interstate commerce for purposes of advertising, promoting, and selling products bearing the Standard Process Trademarks on the Internet without Standard Process's consent.

207.     The products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not authorized for sale by Standard Process.

208.     Standard Process has established and implemented legitimate and substantial quality control procedures that genuine Standard Process Products must comply with.

209.     Standard Process abides by these quality control procedures and requires all of its Authorized Resellers to abide by these quality controls.

210.     Standard Process's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.

211.    The products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements.

212.    Because the products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Standard Process Products.

213.    Because the products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements, the products Defendants sell are not genuine Standard Process Products.

214.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Standard Process Trademarks interfere with Standard Process's quality controls and ability to exercise quality controls over products bearing the Standard Process Trademarks.

215.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to, and abide by, Standard Process's quality controls when, in fact, they do not.

216.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Standard Process Products when, in fact, they are not.

217.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Standard Process when, in fact, they are not.

218.    Defendants' unauthorized use of the Standard Process Trademarks has infringed upon and materially damaged the value of the Standard Process Trademarks and caused significant damage to Standard Process's business relationships.

219.    As a proximate result of Defendants' actions, Standard Process has suffered, and continues to suffer immediate and irreparable harm.  Standard Process has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

220.    Standard Process is entitled to recover the damages caused by Defendants' infringement of the Standard Process Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

221.    Standard Process is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Standard Process will suffer irreparable harm.

222.    Standard Process is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Standard Process Trademarks.

### THIRD CAUSE OF ACTION
**Common Law Trademark Infringement**

223.    Standard Process hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

224.    Standard Process is the owner of the Standard Process Trademarks.

225.    Standard Process has registered the Standard Process Trademarks with the United States Patent and Trademark Office.

226.    The Standard Process Trademarks are valid and subsisting trademarks in full force and effect.

227.    The Standard Process Trademarks are distinctive and widely recognized marks by the consuming public.  Standard Process Products are sold and purchased through its Authorized Resellers throughout the United States, including Wisconsin.

228.    Standard Process is widely recognized as the designated source of goods bearing the Standard Process Trademarks.

229.    Defendants willfully and knowingly used, and continue to use, the Standard Process Trademarks in interstate commerce for purposes of selling products bearing the Standard Process Trademarks on the Internet and in Wisconsin without Standard Process's consent.

230.    The products Defendants sell bearing the Standard Process Trademarks are not authorized for sale by Standard Process.

231.    Standard Process has established and implemented legitimate and substantial quality control procedures that genuine Standard Process Products must comply with.

232.    Standard Process abides by these quality control procedures and requires all of its Authorized Resellers to abide by these quality controls.

233.    Standard Process's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.

234.    The products Defendants sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements.

235.    Because the products Defendants sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Standard Process Products.

236.    Because the products Defendants sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements, the products Defendants sell are not genuine Standard Process Products.

237.    Defendants' unauthorized sale of products bearing the Standard Process Trademarks interferes with Standard Process's quality controls and ability to exercise quality controls over products bearing the Standard Process Trademarks.

238.    Defendants' unauthorized sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to, and abide by, Standard Process's quality controls when, in fact, they do not.

239.    Defendants' unauthorized sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Standard Process Products when, in fact, they are not.

240.    Defendants' unauthorized sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Standard Process when, in fact, they are not.

241.    Defendants' unauthorized use of the Standard Process Trademarks has infringed upon and materially damaged the value of the Standard Process Trademarks and caused significant damage to Standard Process's business relationships.

242.    As a proximate result of Defendants' actions, Standard Process has suffered, and continues to suffer immediate and irreparable harm.  Standard Process has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

243.    Standard Process is entitled to recover the damages caused by Defendants' infringement of the Standard Process Trademarks and to disgorgement of Defendants' profits from their willfully infringing sales and unjust enrichment.

244.    Standard Process is also entitled to punitive damages because Defendants acted maliciously toward Standard Process or in an intentional disregard of the rights of Standard Process.

**FOURTH CAUSE OF ACTION**
**Common Law Unfair Competition**

245.    Standard Process hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

246.    Standard Process is the owner of the Standard Process Trademarks.

247.    Standard Process has registered the Standard Process Trademarks with the United States Patent and Trademark Office.

44

248.     The Standard Process Trademarks are valid and subsisting trademarks in full force and effect.

249.     The Standard Process Trademarks are distinctive and widely recognized marks by the consuming public.  Standard Process Products are sold and purchased through its Authorized Resellers throughout the United States, including Wisconsin.

250.     Standard Process is widely recognized as the designated source of goods bearing the Standard Process Trademarks.

251.     Defendants willfully and knowingly used, and continue to use, the Standard Process Trademarks in interstate commerce for purposes of advertising, promoting, and selling products bearing the Standard Process Trademarks on the Internet and in Wisconsin without Standard Process's consent.

252.     The products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not authorized for sale by Standard Process.

253.     Standard Process has established and implemented legitimate and substantial quality control procedures that genuine Standard Process Products must comply with.

254.     Standard Process abides by these quality control procedures and requires all of its Authorized Resellers to abide by these quality controls.

255.     Standard Process's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.

256.     The products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements.

257.    Because the products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Standard Process Products.

258.    Because the products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements, the products Defendants sell are not genuine Standard Process Products.

259.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Standard Process Trademarks interfere with Standard Process's quality controls and ability to exercise quality controls over products bearing the Standard Process Trademarks.

260.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to, and abide by, Standard Process's quality controls when, in fact, they do not.

261.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Standard Process Products when, in fact, they are not.

262.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Standard Process when, in fact, they are not.

263.     Defendants' unauthorized use of the Standard Process Trademarks has infringed upon and materially damaged the value of the Standard Process Trademarks and caused significant damage to Standard Process's business relationships.

264.     As a proximate result of Defendants' actions, Standard Process has suffered, and continues to suffer immediate and irreparable harm.  Standard Process has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

265.     Standard Process is also entitled to punitive damages because Defendants acted maliciously toward Standard Process or in an intentional disregard of the rights of Standard Process.

### FIFTH CAUSE OF ACTION
**Deceptive Trade Practices**
**Wis. Stat. § 100.18**

266.     Standard Process hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

267.     Standard Process is the owner of the Standard Process Trademarks.

268.     Standard Process has registered the Standard Process Trademarks with the United States Patent and Trademark Office.

269.     The Standard Process Trademarks are valid and subsisting trademarks in full force and effect.

270.     The Standard Process Trademarks are distinctive and widely recognized marks by the consuming public.  Standard Process Products are sold and purchased through its Authorized Resellers throughout the United States, including Wisconsin.

271.     Standard Process is widely recognized as the designated source of goods bearing the Standard Process Trademarks.

272. Defendants willfully and knowingly used, and continue to use, the Standard Process Trademarks in interstate commerce for purposes of advertising, promoting, and selling products bearing the Standard Process Trademarks on the Internet and in Wisconsin without Standard Process's consent.

273. The products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not authorized for sale by Standard Process.

274. Standard Process has established and implemented legitimate and substantial quality control procedures that genuine Standard Process Products must comply with.

275. Standard Process abides by these quality control procedures and requires all of its Authorized Resellers to abide by these quality controls.

276. Standard Process's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.

277. The products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements.

278. Because the products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Standard Process Products.

279. Because the products Defendants advertise, promote, and sell bearing the Standard Process Trademarks are not subject to, do not abide by, and interfere with Standard Process's quality controls and customer service requirements, the products Defendants sell are not genuine Standard Process Products.

280.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Standard Process Trademarks interfere with Standard Process's quality controls and ability to exercise quality controls over products bearing the Standard Process Trademarks.

281.    Defendants' unauthorized use of the Standard Process Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Standard Process Trademarks misrepresents the nature, characteristics, qualities, and origin of Defendants' products because it suggests that the products are subject to, and comply with, Standard Process quality control requirements when they do not.

282.    Defendants' use of the Standard Process Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Standard Process Products when they are not.

283.    Defendants' use of the Standard Process Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Standard Process Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Standard Process when they are not.

284.    Defendants' unauthorized and deceptive use of the Standard Process Trademarks is material and likely to influence customers to purchase the products they sell, as consumers are likely to believe that the products Defendants advertise using the Standard Process Trademarks are genuine Standard Process Products that are subject to Standard Process's quality controls

requirement and come with the benefits associated with genuine Standard Process Products when they do not.

285.     Defendants' use of the Standard Process Trademarks in connection with the unauthorized advertising, promotion, and sale of Standard Process Products is a deceptive trade practice under Wis. Stat. § 100.18.

286.     As a result of Defendants' unlawful actions, Standard Process has suffered, and continues to suffer, irreparable harm.  Standard Process has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

287.     Pursuant to Wis. Stat. § 100.18(11)(a), Standard Process is entitled to injunctive relief enjoining Defendants' conduct.

288.     Pursuant to Wis. Stat. § 100.18(11)(b), Standard Process is entitled to an award of costs and attorneys' fees.

289.     Standard Process is also entitled to punitive damages because Defendants acted maliciously toward Standard Process or in an intentional disregard of the rights of Standard Process.

## SIXTH CAUSE OF ACTION
### Tortious Interference with Contract and Business Relations

290.     Standard Process hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

291.     Standard Process has contracts and business relationships with its Authorized Resellers, who have a contractual right to sell Standard Process Products in accordance with the Standard Process Policies.

292.    The Standard Process Policies and Standard Process's agreements with its Authorized Resellers restrict the manner in which Authorized Resellers may sell Standard Process Products. Specifically, the Standard Process Policies and Standard Process's agreements with its Authorized Resellers stipulate that Authorized Resellers may sell only to end-user consumers through approved channels.  Authorized Resellers are prohibited from selling or transferring Standard Process Products to any person or entity for resale without the prior written consent of Standard Process.

293.    Defendants knew that the Standard Process Policies and Standard Process's agreements with its Authorized Resellers prohibited Standard Process's Authorized Resellers from selling Standard Process Products to third parties, such as Defendants, for purposes of resale.

294.    Defendants were provided notice of this prohibition by at least October 18, 2017, through the cease and desist letter they received from Standard Process.

295.    Despite having knowledge of this prohibition, Defendants willfully and knowingly interfered with the Standard Process Policies and Standard Process's agreements with its Authorized Resellers by inducing Standard Process's Authorized Resellers to breach their agreements and sell products to Defendants so that they could resell them on the Internet.

296.    Defendants acted with a wrongful purpose by acquiring products from Authorized Resellers for the purpose of resale in violation of the Standard Process Policies and Standard Process's agreements with its Authorized Resellers.

297.    Defendants' actions caused injury to Standard Process for which Standard Process is entitled to damages in an amount to be proven at trial.

298.     Standard Process is entitled to punitive damages because Defendants acted with oppression, fraud, and malice.

299.     Standard Process is also entitled to punitive damages because Defendants acted maliciously toward Standard Process or in an intentional disregard of the rights of Standard Process.

## PRAYER FOR RELIEF

WHEREFORE, Standard Process prays for relief and judgment as follows:

A.     Judgment in favor of Standard Process and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.     That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)      Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Standard Process Products;

ii)     Prohibiting the Enjoined Parties from using any of the Standard Process Trademarks in any manner, including advertising on the Internet;

iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Standard Process Products as well as any products bearing any of the Standard Process Trademarks;

iv)   Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Standard Process Trademarks, including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)   Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Standard Process's products, or any of the Standard Process Trademarks;

vi)   Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the Standard Process Trademarks which associate Standard Process's products or the Standard Process Trademarks with the Enjoined Parties or the Enjoined Parties' website;

vii)   Requiring the Enjoined Parties to take all action to remove unauthorized Standard Process Trademarks from the Internet, including from www.amazon.com;

C.   An award of attorneys' fees, costs, and expenses; and

D.      Such other and further relief as the Court deems just, equitable and proper.

Dated this 16th day of October, 2018

Respectfully submitted,

*/s/ Ann M. Maher*
Ann M. Maher
Husch Blackwell LLP
555 East Wells Street
Suite 1900
Milwaukee, WI 53202-3819
Telephone: 414-978-5410
Facsimile: 414-223-5000
Email: ann.maher@huschblackwell.com

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Standard Process demands a trial by jury on all issues so triable.

*/s/ Ann M. Maher*
Ann M. Maher

10/03/2018 30935398 V.5