IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

STANDARD PROCESS INC.,

      Plaintiff,                             OPINION AND ORDER

      v.                                   18-cv-849-wmc

AVC INFINITE, LLC, A VITAMIN A DAY LLC,
ANDREW CHEKAYEV, IRINA PEYSAKHOVICH
and JOHN DOES I-100, individually or as
corporate/business entities,

      Defendants.
_____

Having conducted a hearing on plaintiff's motion for default judgment and permanent injunction (dkt. #12), at which plaintiff appeared by Attorneys Ann Maher and Tyler Pensyl, and defendants failed to appear, the court enters the following opinion and order.

FINDINGS OF FACT[1]

**A. Standard Process and Its Trademarks**

1.     Standard Process develops, manufactures, markets, and sells ingestible nutritional supplements, including products under the Standard Process®, Standard Process Veterinary Formulas™, and MediHerb brands (the "Standard Process Products"). (Compl. (dkt. #1) ¶ 12.)

---

[1] These findings are adopted from the allegations in the complaint on which defendants have defaulted and are now assumed true, as well as additional, undisputed evidence proffered by plaintiff in support of its motion for default judgment.

2. Standard Process sells its products exclusively through a network of authorized resellers ("Authorized Resellers"). (*Id.*)

3. Standard Process has registered several trademarks with the United States Patent and Trademark Office ("USPTO"), including, but not limited to: STANDARD PROCESS® (U.S. Trademark Registration No. 2,329,616), SP® (U.S. Trademark Registration Nos. 2,469,448, 2,888,707, and 3,618,534), SP STANDARD PROCESS® (U.S. Trademark Registration No. 3,726,215), CATALYN® (U.S. Trademark Registration No. 1,476,530), ZYPAN® (U.S. Trademark Registration No. 1,982,691), LIGAPLEX® (U.S. Trademark Registration No. 1,984,258), CATAPLEX® (U.S. Trademark Registration No. 1,984,251), CONGAPLEX® (U.S. Trademark Registration No. 1,995,346), MULTIZYME® (U.S. Trademark Registration No. 2,548,738), ALLERPLEX® (U.S. Trademark Registration No. 2,321,705), GASTREX® (U.S. Trademark Registration No. 2,332,945), SP CLEANSE® (U.S. Trademark Registration No. 2,622,227), GASTRO-FIBER® (U.S. Trademark Registration No. 2,730,337), and SP GREEN FOOD® (U.S. Trademark Registration No. 3,665,686) (collectively, the "Standard Process Trademarks"). (*Id.* ¶ 14.)

4. The registrations for the Standard Process Trademarks appear to be valid, subsisting, and in full force and effect. (*Id.* ¶ 15.)

**B. Online Marketplaces**

5. In recent years, there has been an increase in the amount of retail sales completed through online marketplaces, such as www.amazon.com ("Amazon"). (*Id.* ¶¶ 25-26.) These online marketplaces allow third party sellers to offer a manufacturer's

products for sale essentially anonymously. (*Id*. ¶¶ 25-26.) As a result, unauthorized third party sellers may offer for sale diverted products through the online marketplaces, including damaged, defective, tampered-with, and/or fake products. (*Id*. ¶¶ 27-48.) Because these third party sellers operate anonymously, a manufacturer may lack the ability to exercise quality controls over the products or ensure the products are safe, which presents a potentially serious risk to consumers. (*See id*. ¶¶ 29, 31, 75, 114.)

6.      Anonymous sales by unauthorized sellers through the online marketplaces may also threaten a manufacturer's ability to maintain its goodwill, reputation, and brand integrity. (*Id*. ¶ 32.) A consumer who receives a defective or poor quality product from an unauthorized seller through an online marketplace may become frustrated with the brand. (*Id*. ¶¶ 33-34.) The consumer can also leave a negative review about the brand on the marketplace site, potentially impacting the purchasing decisions of other consumers. (*Id*. ¶¶ 35-38.)

7.      Standard Process has been the victim of multiple negative online marketplace reviews, including on Amazon, from consumers who purchased products bearing the Standard Process Trademarks from unauthorized sellers, including consumer complaints that they received expired, damaged, defective, and/or tampered with products. (*Id*. ¶¶ 39-50.)

### C.  Standard Process Has Implemented Quality Controls to Protect Consumers and Its Brands

8.      To protect consumers and its brands' value and associated goodwill, Standard Process has implemented quality controls that are designed to minimize the

likelihood that poor quality products reach consumers.  (*Id*. ¶¶ 51-71.)  These quality controls include inspection, storage, handling, customer service, and other requirements, assisting with any recalls or other consumer safety information efforts, the prohibition of online sale except with prior written consent, and the prohibition on repackaging, tampering with, or de-facing the products and labeling.  (*Id*.)

9.     To further combat the unauthorized sale of poor quality products on online marketplaces, Standard Process has imposed additional requirements on its Authorized Resellers that are approved to sell online and on the online marketplaces.  (*Id*.  ¶¶ 73-89.)

10.     To allow Standard Process to know where its products are being sold so that it can exercise control over its products and address any quality issues that may arise, Authorized Resellers are prohibited from selling on unauthorized websites and online marketplaces and from selling to other resellers.  (*Id*. ¶ 73.)  Authorized Resellers that are approved to sell on online marketplaces may sell only under storefront names that have been specifically approved by Standard Process and are prohibited from selling products anonymously.  (*Id*. ¶¶ 73-78.)

11.     Standard Process vets its Authorized Resellers before approving them to sell online and on online marketplaces to make sure that each Authorized Reseller operates an appropriate and acceptable business that Standard Process wishes to have representing its brands.  (*See id*. ¶¶ 73-89.)

12.     Authorized Resellers selling online and on the online marketplaces must comply with several additional quality control requirements, including:  opting out of certain repackaging and commingling programs that may result in consumers receiving

used, damaged, expired, or counterfeit products; having a registered business that meets credit, sales history, and facility criteria; having an acceptable online review history without a significant presence of negative product or seller reviews; data security, privacy, and accessibility requirements; a prohibition on reselling opened or repackaged products as in "new" condition; requiring that sales may be only from its own stock; having tools in place to solicit customer feedback and respond to any negative reviews; working with Standard Process to address any such reviews; and maintaining an acceptable online presence and seller rating. (*Id*.)

13. Standard Process monitors its Authorized Resellers to ensure their compliance with Standard Process's quality controls, including conducting reviews of the Authorized Resellers' websites, storefronts, and reviews and conducting test purchases and inspections. (*Id*. ¶¶ 90-92.)

14. The quality controls allow Standard Process to control the quality of products sold under its trademarks, and may be material and relevant to a consumer's purchasing decision. (*Id*. ¶¶ 88, 89.)

**D. Defendants' Unlawful Sales of Standard Process Products**

15. Defendants AVC Infinite, LLC ("AVC"), A Vitamin A Day, LLC ("A Vitamin A Day"), Andrew Chekayev, and Irina Peysakhovich (together, "Defendants") operate storefronts on Amazon under the "Vitaminpro" and "I & G Brothers" (also known as "Stroke of Luck", "Best of NH", "Limitless Vitamins", "Atetrans", and "Valar V") storefronts (the "Storefronts"). Through the Storefronts, Defendants have advertised and sold products bearing the Standard Process Trademarks. (*Id*. ¶¶ 8, 10, 95, 103, 135, 206-

07, 211-17, 251-52, 256-62.) Defendants are not Authorized Resellers of Standard Process Products. (*Id.* ¶ 96.)

16.    The products Defendants sell bearing the Standard Process Trademarks are not genuine Standard Process Products because they do not abide by, but interfere with, Standard Process's quality controls. (*Id.* ¶¶ 130-32.) Specifically, Defendants:

    a.  do not inspect the products they sell for damage, defects, broken seals, evidence of tampering, and other non-conformance from inventory, and sell products bearing the Standard Process Trademarks that are damaged, have broken seals, and that have been tampered with, as well as ship damaged products to customers, *id.* ¶ 116;

    b.  do not regularly inspect their inventory for expired or soon-to-be-expired products and remove those products from inventory; rather, Defendants sell products bearing the Standard Process Trademarks that are expired or soon-to-be expired, *id.* ¶ 117;

    c.  allow their inventory stored at Amazon's warehouses to be commingled with other sellers' inventory, and fake, counterfeit, and tampered-with products from other sellers, ultimately resulting in consumers purchasing fake, counterfeit, and tampered-with products, *id.* ¶ 119;

    d.  cause Amazon to fulfill orders from their storefront with products that are fake, counterfeit, and tampered with, *id.* ¶ 120;

    e.  resell products as "new" that have been opened or repackaged, resulting in consumers who believe they are purchasing new Standard Process

6

Products actually receiving returned products that have been opened or have had their safety seal broken, *id.* ¶ 121; and

f.   ship products in a manner that allows them to become damaged, *id.* at 122.

17.   By selling materially different, non-genuine products bearing the Standard Process Trademarks, Defendants have created consumer confusion because consumers who purchased products from Defendants thought they were getting genuine Standard Process Products that abided by Standard Process's quality controls when, in fact, they were not. (*Id*. ¶¶ 105-08.)

**E.  Defendants' Interference with Standard Process's Agreements With Their Authorized Resellers**

18.   Standard Process's agreements with its Authorized Resellers prohibit Authorized Resellers from selling products to third parties for purposes of resale.  (*Id*. at 168.)

19.   Defendants knew of this prohibition, but have continued to acquire products from Authorized Resellers for the purpose of reselling them and infringing on the Standard Process Trademarks.  (*Id*. ¶¶ 169-73.)

20.   Defendants have acted with an improper purpose because they intended to induce Standard Process's Authorized Resellers to breach their agreements.  (*Id*.)

**F.  Defendants' Actions Have Harmed Standard Process**

21.   Defendants' unlawful actions have caused Standard Process significant harm. Defendants have misled consumers into believing they are purchasing genuine Standard

Process Products that comply with Standard Process's quality controls when, in fact, they are not or at least not consistently.

22. As a proximate result of Defendants' actions, Standard Process has suffered irreparable harm to its reputation, goodwill, and intellectual property rights, and will continue to suffer such harm should Defendant sell Standard Process Products in the future without following quality controls. (*Id*. ¶¶ 174-78.) Standard Process has also suffered monetary harm as a result of Defendants' actions, including loss of sales and damage to its existing and potential business relations. (*Id*. ¶ 176.)

23. Defendants' unlawful actions have been willful and malicious. Standard Process spent significant time and money trying to stop Defendants' illegal sale of its products through the Storefront. (*Id*. ¶ 179.) Standard Process sent Defendants several cease and desist letters, but Defendants refused to comply and continued to sell products bearing the Standard Process Trademarks. (*Id*. ¶¶ 142-61.) Further, despite being served with the Summons and Complaint in this action, Defendants have chosen not to appear and continued to engage in their unlawful conduct resulting in entry of default against them by the clerk pursuant to Fed. R. Civ. P. 55(a).

## OPINION

Under Federal Rule of Civil Procedure 55(b)(2), a court may enter default judgment after the clerk has entered default against a party based on that party's failure to plead or otherwise defend an action. *Conway v. Leonard*, Nos. 03-C-535-C, 03-C-536-C, 03-C-539-C, 2005 U.S. Dist. LEXIS 3659, at *4 (W.D. Wis. Mar. 7, 2005). Here, defendants were

properly served with a copy of the Complaint and Summons on October 23 and 25, 2018, and the Clerk properly entered the Entry of Default on May 1, 2019. (Dkt. ##4-7; Maher Decl. (dkt. #15) ¶¶ 5-6.)

This court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 and 28 U.S.C. § 1367, as well as personal jurisdiction over Defendants by purposefully availing themselves of the privilege of doing business in Wisconsin through significant and regular sales of infringing products bearing the Standard Process Trademarks to Wisconsin with the knowledge that Standard Process is located in Wisconsin and will be harmed in Wisconsin. (*See* Compl. (dkt. #1) ¶¶ 8-10, 135-37, 229, 251, 272) *See Standard Process Inc. v. KDealz Ltd. Co.*, No. 17-cv-909-jdp, 2018 U.S. Dist. LEXIS 102976, at *1 (W.D. Wis. June 20, 2018) (personal jurisdiction over unauthorized seller selling infringing products bearing the Standard Process Trademarks on Amazon); *Illinois v. Hemi Group LLC*, 622 F.3d 754, 757-58 (7th Cir. 2010) (out-of-state defendant's offering of products for sale to Illinois residents through website sufficient to confer jurisdiction); *Grand River Enters. Six Nations v. VMR Prods. LLC*, No. 13-cv-104-wmc, 2013 U.S. Dist. LEXIS 167601, at *6 (W.D. Wis. Nov. 26, 2013) (out-of-state defendant's internet sales to Wisconsin residents established jurisdiction over defendant); *Monster Energy Co. v. Chen Wensheng*, 136 F. Supp. 3d 897, 906 (N.D. Ill. 2015) (jurisdiction over out-of-state defendant who offered infringing products to Illinois residents through a storefront on Aliexpress.com); *Valtech, LLC v. 18th Ave. Toys Ltd.*, No. 14 C 134, 2015 U.S. Dist. LEXIS 17138, at *14 (N.D. Ill. Feb. 12, 2015) (jurisdiction over out-of-state defendant selling infringing products through storefront on Amazon).

Default judgment is appropriate if there is a sufficient basis in the pleadings for the judgment and the unchallenged facts constitute a legitimate cause of action. *Black v. Lane*, 22 F.3d 1395, 1403 (7th Cir. 1994). The well-pleaded facts of the complaint are accepted as true as they relate to liability. *VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016). As set forth below, plaintiff has pleaded sufficient, unchallenged facts to state a legitimate cause of action as to each of its claims.

### A. Trademark Infringement and Unfair Competition

To state a claim for trademark infringement under 15 U.S.C. §§ 1114, 1125(a)(1)(a), unfair competition under 15 U.S.C. § 1125(a)(1)(A), common law unfair competition, and common law trademark infringement, plaintiff Standard Process must establish: (1) it has a protectable interest in the trademark; (2) defendant used an identical or similar mark in commerce; and (3) defendant has likely confused customers by using the mark. *See Microsoft Corp. v. V3 Sols., Inc.*, No. 01 C 4693, 2003 U.S. Dist. LEXIS 15008, at *19 (N.D. Ill. Aug. 27, 2003) (setting forth federal Lanham Act trademark infringement and unfair competition standards); *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1026 (E.D. Wis. 2018) (same test, likelihood of confusion, applies for Wisconsin common law claims). The facts set forth above establish each of these elements.

Specifically, plaintiff has a protectable interest, as the Standard Process Trademarks appear to be registered, valid, subsisting, and in full force and effect, and Standard Process uses those marks to advertise and sell Standard Process Products. (Compl. (dkt. #1) ¶¶ 13-24.) Defendants have also used the Standard Process Trademarks in commerce by advertising, selling, and distributing products bearing the mark. (*Id*. ¶¶ 8, 10, 95, 103,

135, 206-07, 211-17, 251-52, 256-62.)  Defendants have further caused consumer confusion by selling materially different, non-genuine products bearing the Standard Process Trademarks that do not comply with its quality controls without disclosing these differences to consumers.  (*Id*. ¶¶ 130-32.)

Products sold outside a manufacturer's authorized distribution system are not genuine products unless sold in their original packaging, within expiration dates, and otherwise sold consistent with the manufacturer's quality controls pursuant to the "first sale" date.  *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) ("goods are not genuine if they do not conform to the trademark holder's quality control standards"); *Shell Oil Co. v. Comm. Petro. Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) ("A product is not truly 'genuine' unless it is manufactured and distributed under quality controls established by the manufacturer."); *Warner-Lambert Co. v. Northside Dev. Corp*, 86 F.3d 3, 5-8 (2d Cir. 1996) (reversing denial of injunction and ordering entry of injunction where defendant was selling HALLS cough drops and cough suppressant tablets in a manner inconsistent with plaintiff's quality controls designed to limit the sale of stale products).  This follows because "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."  *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996) (quoting *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 393, 395 (2d Cir. 1986)).

A mark owner also has a claim for trademark infringement against a defendant that is reselling products outside its quality controls if: (i) the owner has established legitimate,

substantial, and non-pretextual quality control procedures; (ii) the owner abides by these procedures; and (iii) the non-conforming sales will diminish the value of the mark. *Warner-Lambert Co.*, 86 F.3d at 6. Standard Process has implemented legitimate and substantial quality controls that its Authorized Resellers must follow. (*Id*. ¶¶ 51-92.) Defendants do not comply with these quality controls and their sale of products bearing the Standard Process Trademarks outside of Standard Process's quality control program interfere with Standard Process's quality controls and its ability to exercise control over products bearing its trademarks. (*Id*. ¶¶ 94-103, 112-37.) At least some of the products Defendants have sold do not meet Standard Process's Products quality controls and their sales may have diminished the value of the Standard Process Trademarks. (*Id*. ¶¶ 130-32.) These actions are further likely to cause consumer confusion because consumers who purchase products from Defendants think they are getting genuine Standard Process Products that comply with its quality controls when they are not. (*Id*.)

### B. Deceptive Trade Practices Under Wis. Stat. § 100.18

Standard Process has also stated a claim for unfair and deceptive trade practices under Wis. Stat. § 100.18. To state such a claim, a plaintiff must show that the defendant used untrue statements to sell its wares to the public. *United Concrete & Const., Inc. v. Red-D-Mix Concrete, Inc.*, 2013 WI 72, ¶ 15, 349 Wis. 2d 587, 836 N.W.2d 807; *see also State v. Am. TV & Appliance of Madison, Inc.*, 146 Wis. 2d 292, 304, 430 N.W.2d 709, 713 (1988).

Here, Standard Process has stated a claim for deceptive trade practices. First, Defendants used the Standard Process Trademarks to advertise and promote products in

an effort to lead consumers to believe that they were selling genuine Standard Process Products that came with all the benefits of genuine Standard Process Products, including original packaging, freshness, and other quality controls. (Compl. (dkt. #1) ¶¶ 282-84.) Second, Defendants knowingly advertised and sold non-genuine products to consumers for a profit when those goods did not conform to the same quality controls as Standard Process products, allowing Defendants to profit off consumers who relied on those representations. (*Id*. ¶¶ 128-36, 142-44, 147-53, 155-57, 160-164, 194-96, 282-84.) Third, Defendants' use of the Standard Process Trademarks to advertise and sell the products that did not conform with Standard Process's quality controls influenced customers to purchase the products Defendants sold. (*Id*. ¶ 284.) Fourth, Standard Process has been harmed as a result of Defendants' deceptive trade practices. (*Id*. ¶¶ 174-78, 286.)

### C. Tortious Interference with Contract

Finally, to state a claim of tortious interference, plaintiff has to show: (1) it had a contract or prospective contractual relationship with a third party; (2) defendant interfered with the relationship or contract; (3) defendant's actions were intentional; (4) a causal connection exists between the interference and the damages; and (5) the interference with the contract was not justified. *Tele-Port, Inc. v. Ameritech Mobile Communs., Inc*., 49 F. Supp. 2d 1089, 1092 (E.D. Wis. 1999).

Here, Standard Process has specific agreements with its Authorized Resellers that prohibit them from selling Standard Process Products to third parties who intend to resell the products. As set forth above, Defendants knew of this prohibition and intended to induce a breach of these agreements for the purpose of resale. Defendants' purchase and

resale of Standard Process Products from Authorized Resellers did, in fact, produce a breach. (*Id*. ¶¶ 142, 169-73, 293-97.) Moreover, Defendants' interference with the agreements was improper because they acted with the intent to directly induce the breach of the agreements, with the motive to profit off of selling poor quality Standard Process Products and misleading purchasers about the source of the products, and with no regard to its interests in protecting its brand and the rights to do it under the agreements with Authorized Resellers. (*Id*. ¶¶ 109-11, 114, 164, 166, 173, 295-96.) As a result of Defendants' actions, Standard Process has suffered damages. (*Id*. ¶¶ 171-73, 297.) As such, Standard Process has properly stated a claim for tortious interference. *See Duct-O-Wire Co. v. U.S. Crane*, 31 F.3d 506, 510 (7th Cir. 1994) (affirming grant of preliminary injunction for tortious interference where plaintiff suffered harm to goodwill and reputation from continued action by defendant).

For the foregoing reasons, Default Judgment will be entered in this matter against Defendants pursuant to Federal Rule of Civil Procedure 55(b)(2) as set forth below.

## PERMANENT INJUNCTION

The Lanham Act authorizes a district court to issue an injunction according to the principles of equity and upon such terms as the court may deem reasonable to prevent violations of trademark law. 15 U.S.C. § 1116(a). To determine whether injunctive relief is appropriate, courts weigh whether: (1) plaintiff has suffered or will suffer an irreparable injury; (2) plaintiff lacks an adequate remedy at law; (3) the balance of the hardships between the parties favors injunctive relief; and (4) the public interest is not averse to an

injunction. *Spectrum Brands, Inc. v. I&J Apparel, LLC*, No. 16-cv-741-jdp, 2017 U.S. Dist. LEXIS 80999, at *5 (W.D. Wis. May 25, 2017).

A permanent injunction is warranted in this case because a balancing of these factors weighs strongly in favor of granting Standard Process a permanent injunction. *See id.; Otter Prods., LLC*, 2019 U.S. Dist. LEXIS 52916, at *16-20 (granting a permanent injunction in a substantially similar case); *ADG Concerns, Inc*, 2018 U.S. Dist. LEXIS 155542, at *26-32 (same). First, taking its allegations as true, as this court must in light of Defendants' default, plaintiff will suffer irreparable injury if Defendants continue to advertise and sell products bearing the Standard Process Trademarks without exercising quality controls. (Compl. ¶¶ 32-36, 128, 177-78.) *See Spectrum Brands, Inc.*, 2017 U.S. Dist. LEXIS 80999, at *5 (finding that a loss of goodwill alone is sufficient for a finding of irreparable harm, and finding such a loss in the continued sale of infringing products by defendants). Second, plaintiff lacks an adequate remedy at law because Defendants' continued non-conforming sales will cause damage to Standard Process's intellectual property, goodwill, and brand integrity. (Compl. ¶¶ 177-78.) *See Spectrum Brands, Inc.*, 2017 U.S. Dist. LEXIS 80999, at *5. Third, the balance of hardships between the parties favors injunctive relief. Plaintiff has expended substantial time and money developing and protecting the Standard Process Trademarks and without an injunction it will be unable to protect its trademarks and stop Defendants' non-conforming sales. (Compl. ¶¶ 51-56, 139-40, 144, 158-59.) *See Spectrum Brands, Inc.*, 2017 U.S. Dist. LEXIS 80999, at *5-6 (finding balance weighed in favor of trademark owner and that no harm would be suffered by an infringer where the infringer is enjoined from selling only infringing products); *Shenzhen Ruobilin Network Tech., Ltd. v.*

*SJG-Lens*, No. 16-cv-386-wmc, 2017 U.S. Dist. LEXIS 88555, at *4 (W.D. Wis. June 9, 2017) ("[T]rademark infringement, by [its] very nature, carr[ies] a presumption of harm."). Finally, the public interest lies in favor of upholding Standard Process's trademark rights and preventing customer confusion. *Spectrum Brands, Inc.*, 2017 U.S. Dist. LEXIS 80999, at *6.[2]

## DAMAGES

Under the Lanham Act, a trademark owner may also recover profits derived from a defendant's infringement of its trademarks. 15 U.S.C. § 1117(a); *Spectrum Brands, Inc.*, 2017 U.S. Dist. LEXIS 80999, at *7 (awarding all of defendant's profits where defendant continued to sell infringing products on online stores after it was aware its products were infringing and failed to appear in the matter); *Shenzhen Ruobilin Network Tech., Ltd*, 2017 U.S. Dist. LEXIS 88555, at *3. Moreover, to establish a defendant's profits, plaintiff is required to prove only the defendant's sales; it is then the defendant's burden to submit evidence of costs and deductions. *WMS Gaming, Inc. v. WPC Prods. Ltd*., 542 F.3d 601, 607 (7th Cir. 2008). If the defendant does not present any evidence of its costs and deductions, as is true here, courts may even award the defendants' total sales to the plaintiff as disgorged profits. *Id*. (plaintiff entitled to all revenues from U.S. sales supported by evidence where no deductions demonstrated by defendant). Moreover, plaintiff is required to establish the defendant's sales only "with reasonable certainty." *WMS Gaming, Inc.*, 542

---

[2] As set forth in the order below, some of the injunctive relief will be for a period of five years given the apparent failures by defendants to take reasonable steps to compete legally in the secondary marketplace, while defendants will be permanently enjoined from: (1) further violations of trademark infringement and unfair competition law and (2) tortious interference of Standard Process's relationship with its Authorized Resellers.

F.3d at 607; *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993); *Klein-Becker USA, Ltd. Liab. Co. v. Englert*, 711 F.3d 1153, 1163 (10th Cir. 2013).

Standard Process has presented evidence that Defendants' sales of its products from October 1, 2017 to May 1, 2019, amounted to $35,114.55. (Wells Decl. (dkt. #16) ¶ 22.) Standard Process calculated this total from data collected through a monitoring tool called TriGuardian, which monitors listings and sales of products on Amazon and calculates the amount of sales that a particular storefront makes of certain products. Standard Process pulled data from TriGuardian regarding Defendants' sales of Standard Process Products from October 1, 2017, through May 1, 2019, for each respective Amazon.com storefront. (*Id*. ¶¶ 3-13.) The data shows over 740 products sold by the Storefronts amounting to $35,114.55 in total sales, including 380 products amounting to $16,782.15 sold by the "Vitaminpro" storefront and 365 products amounting to $18,332.40 sold by the "I & G Brothers" storefront. (*Id*. ¶¶ 15-23; *id.*, Ex. A (dkt. #16-1) (showing data of sales).) As such, Standard Process has shown Defendants' profits with reasonable certainty. *See Otter Prods., LLC*, 2019 U.S. Dist. LEXIS 52916, at *20-21 (holding TriGuardian established defendant's sales with reasonable certainty); *ADG Concerns, Inc.*, 2018 U.S. Dist. LEXIS 155542, at *32-34 (same). Defendants have presented no evidence of costs or other deductions that should reduce the award of all sale of infringing products as disgorged profits.

Unfortunately, Standard Process has provided no proof as to how many of Standard Process's products were purchased from Authorized Resellers (rather than from an entity outside Standard Process's approved distribution chain), nor how many of its products sold

did not meet its quality control standards, making any entry of monetary damages speculative. Even acknowledging the difficulty of proving the actual source of the non-conforming sales, plaintiff could have at least purchased some of this product to assign a reasonable percentage to non-conforming products. Absent such proof, or some other evidence that *all*, or at least a large percent, of defendants' resold products were purchased directly from one of plaintiff's Authorized Resellers or inconsistent with its controls, plaintiff has failed to produce sufficient evidence to support an award of monetary damages.

### ORDER

Accordingly, IT IS ORDERED that final judgment shall be entered as follows:

1. Plaintiff's motion for default judgment (dkt. #12) is GRANTED;

2. Defendants and any of their employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants (the "Enjoined Parties") are:

   a. ENJOINED for five years from:

      i. advertising or selling all Standard Process Products or products bearing the Standard Process Trademarks through any Amazon storefront, including, but not limited to, the Amazon storefronts currently named "Valar V" and "Vitaminpro";

      ii. advertising or selling, via the Internet, all Standard Process products or products bearing the Standard Process Trademarks;

iii. using any of the Standard Process Trademarks in any manner, including advertising on the Internet;

iv. importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Standard Process Products, as well as any products bearing any of the Standard Process Trademarks;

v. disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Standard Process Trademarks, including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

b. PERMANENTLY ENJOINED FROM:

i. purchasing for resale any Standard Process products or products bearing the Standard Process Trademarks from an Authorized Reseller or any other entity the Enjoined Parties have reason to believe is contractually prevented from selling to a reseller; and

ii. selling any Standard Process products or products bearing the Standard Process Trademarks unless still in its original packaging at least six months from its designated expiration date, and otherwise in reasonable compliance with Standard Process's quality controls.

3. In addition, Defendants SHALL:

    a. take all action to remove from the Enjoined Parties' websites or storefronts any reference to any of Standard Process Products, or any of the Standard Process Trademarks;

    b. take all action, including but not limited to, requesting Internet search engines (such as Google, Yahoo!, and Bing) to remove from the Internet any of the Standard Process Trademarks, which associate Standard Process Products or the Standard Process Trademarks with the Enjoined Parties or the Enjoined Parties' websites or storefronts; and

    c. take all action to remove unauthorized Standard Process Trademarks from the Internet, including from Amazon.

4. Pursuant to Rule 65(d)(2) of the Federal Rules of Civil Procedure, this Order is binding upon the following persons who receive actual notice of it: the parties, the parties' officers, agents, servants, employees, and attorneys.

5. Both the Lanham Act and Wis. Stat. § 100.18 have fee shifting provisions. *See* 15 U.S.C. § 1117(a) (authorizing an award of attorney's fees in "exceptional cases"); Wis. Stat. § 100.18(11)(b)2 (authorizing an award of "reasonable attorney fees"); *see also Epic Sys. Corp. v. Silver*, No. 13-CV-355-WMC, 2014 WL 2694051, at *2 (W.D. Wis. June 13, 2014) ("[D]efendant's default and his apparent utter disregard for Epic's intellectual property rights make this an 'exceptional case' under 15 U.S.C. § 1117, justifying an award of Epic's attorney's fees and costs in this litigation."). As such, plaintiff remains free to seek

reimbursement of its reasonable fees and costs of litigation. In filing such a request, plaintiff's counsel should include their time records and proof of payment of invoices.

6. This court shall retain subject matter jurisdiction for the purpose of enforcing and/or adjudicating claims for violation of this Final Judgment and Permanent Injunction. Any such matters shall be raised by noticed motion.

Entered this 9th day of January, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge